Elizabeth **CORKEY**, Charles Hendricks, Roy Parker, Richard Burt and Arthur Jones, Plaintiffs,

v.

Dan K. **EDWARDS**, Thomas D. Cooper, Jr., Thomas W. Moore, Jr. and Jerry W. Whitley, Defendants.

Civ. No. 2665.

United States District Court, W. D. North Carolina, Charlotte Division.

Argued Nov. 5, 1970.

Decided Feb. 1, 1971.

George S. Daly, Jr., Charlotte, N. C., Michael Katz, Evanston, Ill., and Roy Lucas, New York City, for plaintiffs.

James L. Blackburn, Raleigh, N. C., Staff Atty. for Attorney General's Office, and Arnold H. Loewy, Chapel Hill. N. C., for defendants.

Before CRAVEN, Circuit Judge, and JONES and McMILLAN, District Judges.

CRAVEN, Circuit Judge:

This is a class action brought before a three-judge court, 28 U.S.C. § 2281, to have the North Carolina Abortion Statute,[1] G.S. §§ 14-44 to 14-45.1, de-

1. The statute reads:

§ 14-44. Using drugs or instruments to destroy unborn child.—If any person shall wilfully administer to any woman, either pregnant or quick with child, or prescribe for any such woman, or advise or procure any such woman to take any medicine, drug or other substance whatever, or shall use or employ any instrument or other means with intent thereby to destroy such child, he shall be guilty of a felony, and shall be imprisoned in the State's prison for not less than one year nor more than ten years, and be fined at the discretion of the court.

§ 14-45. Using drugs or instruments to produce miscarriage or injure pregnant woman.—If any person shall administer to any pregnant woman, or prescribe for any such woman, or advise and procure such woman to take any medicine, drug or anything whatsover, with intent thereby to procure the miscarriage of such woman, or to injure or destroy such woman, or shall use any instrument or application for any of the above purposes, he shall be guilty of a felony, and shall be imprisoned in the jail or State's prison for not less than one year nor more than five years and shall be fined, at the discretion of the court.

§ 14-45.1. When abortion not unlawful.—Notwithstanding any of the provisions of G.S. 14-44 and 14-45, it shall not be unlawful to advise, procure, or cause the miscarriage of a pregnant woman or an abortion when the same is performed by a doctor of medicine licensed to practice medicine in North Carolina, if he can reasonably establish that:

There is substantial risk that continuance of the pregnancy would threaten the life or gravely impair the health of the said woman, or

There is substantial risk that the child would be born with grave physical or mental defect, or

The pregnancy resulted from rape or incest and the said alleged rape was reported to a law-enforcement agency or court official within seven days after the alleged rape, and

Only after the said woman has given her written consent for said abortion to be performed, and if the said woman shall be a minor or incompetent as adjudicated by any court of competent jurisdiction then only after permission is given in writing by the parents, or if married, her husband, guardian or person or persons standing in loco parentis to said minor or incompetent, and

Only when the said woman shall have resided in the State of North Carolina for a period of at least four months immediately preceding the operation being performed except in the case of emergency where the life of the said woman is in danger, and

Only if the abortion is performed in a hospital licensed by the North Carolina Medical Care Commission, and

Only after three doctors of medicine not engaged jointly in private practice, one of whom shall be the person performing the abortion, shall have examined said woman and certified in writing the circumstances which they believe to justify the abortion, and

Only when such certificate shall have been submitted before the abortion to the hospital where it is to be performed; provided, however, that where an emergency exists, and the certificate so states, such certificate may be submitted within twenty-four hours after the abortion.

clared unconstitutional and its enforcement enjoined.

Although the law is no respecter of persons, plaintiffs' very occupations lend credence to their contention that the state may not constitutionally prevent or circumscribe the fundamental right of a woman to choose whether or not to bear children and to prevent it by abortion if she and her physician should decide to do so.

Dr. Elizabeth Corkey is the Medical Director of the Mecklenburg County Family Planning Clinic, a medical expert in obstetrics and contraception, and formerly a medical missionary. Plaintiffs Hendrix, Parker and Burt are also doctors of medicine and respectively the Chairmen of the Departments of Obstetrics and Gynecology at the teaching hospitals of the University of North Carolina, Duke University and Wake Forest University. Each is a registered and licensed physician and surgeon under North Carolina law and each is certified as a specialist in the field of obstetrics and gynecology. Plaintiff Jones is a member of the North Carolina General Assembly and was largely responsible for the passage of the 1967 amendment to the statutes challenged in this law suit. For many years he has been an interested student of contraception, abortion and family planning. It is interesting that he asks the court to invalidate a statute for which he is largely responsible. His position is that it is the least restrictive legislation he could get enacted but that even so it is an unconstitutional burden on fundamental liberty.

Unquestionably, every one of the five plaintiffs is a qualified and informed expert on the problem of abortion in North Carolina. Indeed, each of them is doubtless qualified to testify as an expert witness in this very case. Although we deeply respect their informed opinions that the state has no justifiable interest in interfering with a woman's fundamental right to choose whether or not to bear children and implementing that right by choosing to abort, we

think such a conclusion necessarily involves a value judgment we may not properly make. It seems to us the legislature may not unreasonably conclude that there is a sufficient public interest in protecting the embryo to permit limited statutory intrusion into what would otherwise be a protected zone of privacy. In only one minor respect do we hold the statute unconstitutional: the residency requirement as a condition precedent to obtaining a therapeutic abortion unconstitutionally, we think, limits the right to travel.

We avoid another serious constitutional problem by interpretation. We think the legislature did not intend to reverse the presumption of innocence, and that the burden of proof in a prosecution is on the state to show that an abortion did not come within the exemptions of G.S. § 14–45.1.

■ Despite the several assertions made by the state concerning matters of jurisdiction, we decline to dismiss on these grounds. The issues have been exhausted in other actions considering abortion laws, and we therefore deal with them summarily. First, we find that this is not a proper case in which to apply the doctrine of abstention, there being no state court interpretation of the statute that would alter the statute's constitutional impact. Zwickler v. Koota, 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed. 2d 444 (1967); Doe v. Randall, 314 F. Supp. 32 (D.Minn.1970). Nor do we accept the argument that justiciability fails for lack of standing. Flast v. Cohen, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed. 2d 947 (1968); Roe v. Wade, 314 F. Supp. 1217, 1220 (N.D.Tex.1970); see Berger, Standing to Sue in Public Actions, Is It a Constitutional Requirement? 78 Yale L.J. 816 (1969). Finally, we agree that the plaintiffs are able to represent the rights of the class whose members they seek to protect. See Griswold v. Connecticut, 381 U.S. 479, 481, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); Roe v. Wade, *supra*, 314 F.Supp. at 1219–1220.

## I.

There is nothing in the United States Constitution about birth, contraception or abortion. But in Griswold v. Connecticut, *supra,* the Supreme Court derived from the several amendments to the Constitution a right of privacy. We are urged to extend Griswold v. Connecticut, *supra,* and its zone of privacy to insulate abortion from legislative control. In *Griswold* the Supreme Court recognized a zone of marital privacy into which the state may not constitutionally intrude where its only interest in doing so was said to be the discouragement of extramarital sexual relations. Thus, the court struck down Connecticut's law forbidding the giving of information and instruction and advice to married persons as to the means of preventing conception.

We agree with plaintiffs that there is no more precious aspect of the concept of liberty than the right to be left alone. As Mr. Justice Brandeis said dissenting in Olmstead v. United States, 277 U.S. 438, 478, 48 S.Ct. 564, 572, 72 L.Ed. 944 (1928):

> The makers of our Constitution undertook to secure conditions favorable to the pursuit of happiness. They recognized the significance of man's spiritual nature, of his feelings, and of his intellect. They knew that only a part of the pain, pleasure and satisfactions of life are to be found in material things. They sought to protect Americans in their beliefs, their thoughts, their emotions and their sensations. They conferred, as against the government, the right to be let alone—the most comprehensive of rights and the right most valued by civilized men.

Even earlier, in Union Pacific Railway Company v. Botsford, 141 U.S. 250, 251, 11 S.Ct. 1000, 1001, 36 L.Ed. 734 (1891), the Court said:

> No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint and interference of others, unless by clear and unquestionable authority of law. As well said by Judge Cooley, 'The right to one's person may be said to be a right of complete immunity: to be let alone'.

We also agree with plaintiffs that whether or not to bear a child is ordinarily and up to a point within the zone of privacy of a woman and that she has the right to be let alone in making that determination. In short, it is none of the state's business whether a woman chooses to become pregnant, and beyond its province to forbid the practice of contraception. Griswold v. Connecticut, *supra.*

But that is not quite the question in this case. We think it is this: Can the State of North Carolina constitutionally assign to the human organism in its early prenatal development as embryo and fetus the right to be born (with certain exceptions as set out in the statute)? We think the answer must be "yes".

For the purposes of this case we assume, if we are not required to recognize, *e. g.*, Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678 (1965); Baird v. Eisenstadt, 1 Cir., 1970, 429 F.2d 1398, that as a general matter women possess under our Constitution a "fundamental right" to determine whether they shall bear children before they have become pregnant. A state may interfere with this right of choice only in special circumstances. *E. g.*, Buck v. Bell, 274 U.S. 200, 47 S.Ct. 584, 71 L.Ed. 1000 (1927). We deal in this case, however, not merely with whether a woman has a generalized right to choose whether to bear children, but instead with the more complicated question whether a pregnant woman has the right to cause the abortion of the embryo or fetus she carries in her womb. We do not find that an equation of the generalized right of the woman to determine whether she shall bear children with the asserted right to abort an embryo or fetus is compelled by fact or logic. Exercise of the right to an abortion on request is not essential to

an effective exercise of the right not to bear a child, if a child for whatever reason is not wanted. Abstinence, rhythm, contraception and sterilization are alternative means to this end. The first is, of course, infallible; the latter three are reliable to varying degrees approaching certainty. Before the "moment" of conception has occurred, *see generally* Ziff, Recent Abortion Law Reforms (Or Much Ado About Nothing), 60 J.Crim. L.C. & P.S. 3, 20–21 (1969), the choice whether or not to bear children is made in circumstances quite different from those in which such a choice might be made after conception. Apart, the sperm and the unfertilized egg will die; neither has the capacity to grow and develop independently as does the fertilized egg. During fertilization, sperm and egg pool their nucleii and chromosomes. Biologically, a living organism belonging to the species homo sapiens is created out of this organization. Genetically, the adult man was from such a beginning all that he essentially has become in every cell and human attribute. *See generally* Gray, Anatomy of the Human Body 21–60 (Goss 27th ed. 1959); 5 Lawyers' Medical Cyclopedia § 37.1 (1960). The basic distinction between a decision whether to bear children which is made before conception and one which is made after conception is that the first contemplates the creation of a new human organism, but the latter contemplates the destruction of such an organism already created. To some engaged in the controversy over abortion, this distinction is one without a difference. These men of intelligence and good will do not perceive the human organism in the early part of its life cycle as a human "being" or "person". In their view, the granting to such an organism of the right to survive on a basis of equality with human beings generally should be delayed until a later stage in its development. To others, however, the "moment" of conception or some stage of development very close to this "moment" is the point at which distinctively human life begins. In their view, the difference between the decision not to conceive and the decision to abort is of fundamental, determinative importance. Thus the root problem in the controversy over abortion is the one of assigning value to embryonic and fetal life. *See* Giannella, The Difficult Quest for a Truly Humane Abortion Law, 13 Vill.L.Rev. 257 (1968).

"In considering the problem of valuing prenatal life, we heed the words of Mr. Justice Holmes:

'It is a misfortune if a judge reads his conscious or unconscious sympathy with one side or the other prematurely into the law, and forgets that what seem to him to be first principles are believed by half his fellow men to be wrong * * *.'

Holmes, Collected Legal Papers 295 (1920). When distinctively human life begins is a matter about which reasonable, fair-minded men are in basic disagreement. Thus this case does not concern simply whether the pregnant woman has a fundamental right to be let alone in the control of her body processes, *cf.* Union Pac. Ry. Co. v. Botsford, 141 U.S. 250, 11 S.Ct. 1000, 35 L.Ed. 734 (1891) (submission to surgical examination), for it is unresolved whether, in the common understanding of the society in which she lives, choice of the destiny of the human organism developing within her is a matter directly affecting only her individual rights." Rosen v. Louisiana State Board of Medical Examiners, 318 F.Supp. 1217, 1224 (E.D.La.1970) (footnotes omitted).

Our inquiry must focus on the nature and extent of the state interest necessary to justify an invasion of the fundamental right of privacy. We are mindful of Holmes' admonition in his now vindicated [2] dissent in Lochner v. State

2. *See, e. g.,* Williamson v. Lee Optical of Oklahoma, 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955); Giboney v. Empire Storage and Ice Company, 336 U.S. 490, 69 S.Ct. 684, 93 L.Ed. 834 (1949); Lincoln Federal Labor Union

of New York, 198 U.S. 45, 74, 25 S.Ct. 539, 49 L.Ed. 937 (1905), that the Constitution "is made for people of fundamentally differing views, and the accident of our finding certain opinions natural and familiar, or novel, and even shocking, ought not to conclude our judgment upon the question whether statutes embodying them conflict with the Constitution of the United States." 198 U.S. at 76, 25 S.Ct. at 547.

The concept of state interest is one that has evaded specific definition.[3]

> An attempt to define its reach or trace its outer limits is fruitless, for each case must turn on its own facts. The definition is essentially the product of legislative determination addressed to the purposes of government, purposes neither abstractly nor historically capable of complete definition. Subject to specific constitutional limitations, when the legislature has spoken, the public interest has been declared in terms well-nigh conclusive.
>
> &ast; &ast; &ast; &ast; &ast; &ast;
>
> Public safety, public health, morality, peace and quiet, law and order—these are some of the more conspicuous examples of the traditional application of the police power to municipal affairs. Yet they merely illustrate the scope of the power and do not delimit it.

Berman v. Parker, 348 U.S. 26, 32, 75 S.Ct. 98, 99 L.Ed. 27 (1954).

To determine the state interest we shall not attempt to choose between extreme positions. Whether possessing a soul from the moment of conception or mere protoplasm, the fertilized egg is, we think, "unique as a physical entity," Lucas, Federal Constitutional Limitations of the Enforcement and Administration of State Abortion Statutes, 46 N.C.L.Rev. 730, 744 (1968), with the potential to become a person. Whatever that entity is, the state has chosen to protect its very existence. The state's power to protect children is a well established constitutional maxim. See, Shelton v. Tucker, 364 U.S. 479, 485, 81 S. Ct. 247, 5 L.Ed.2d 231 (1960); Prince v. Massachusetts, 321 U.S. 158, at 166–168, 64 S.Ct. 438, 88 L.Ed. 645. That this power should be used to protect a fertilized egg or embryo or fetus during the period of gestation embodies no logical infirmity, but would seemingly fall within the "plenary power of government." Poe v. Ullman, 367 U.S. 497, at 539, 81 S.Ct. 1752, 6 L.Ed.2d 989 (Harlan, J., dissenting). That there is a state interest has until recently been taken for granted. History sides with the state.[4]

In Babbitz v. McCann, 310 F.Supp. 293 (E.D.Wis.1970), a three-judge court sitting in judgment of Wisconsin's abortion law recognized the interest of the unborn child as well as that of the mother. That court chose to weigh the two: "For the purposes of this decision, we think it is sufficient to conclude that the mother's interests [before quickening] are superior to that of an unquickened embryo, &ast; &ast; &ast;" *Id.* at 301. See also, Roe v. Wade, 314 F.Supp. 1217 (N. D.Tex.1970). Striking such a balance is not unreasonable. It may, indeed, be wide, humane and enlightened, but we

No. 19129 A.F. of L. v. Northwestern Iron & Metal Company, 335 U.S. 525, 69 S.Ct. 251, 93 L.Ed. 212 (1949); Olsen v. Nebraska, 313 U.S. 236, 61 S.Ct. 862, 85 L.Ed. 1305 (1941); West Coast Hotel Co. v. Parrish, 300 U.S. 379, 57 S.Ct. 578, 81 L.Ed. 703 (1937).

3. *See, e. g.*, United States v. O'Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968).

4. Under the common law in England, and in the early periods of this country's existence, it was a crime to commit acts leading to an abortion only after "quickening", but the scope of the prohibited period was extended to cover the entire time from conception to natural birth by statute in this country beginning in the latter part of the nineteenth century. Lucas, Federal Constitutional Limitations on the Enforcement and Administration of State Abortion Statutes, 46 N.C.L.Rev. 730, 731–35 (1968). The North Carolina statute in question was enacted in its original form in 1881 and thereafter not amended until 1967.

submit it is a value judgment not committed to the discretion of judges but reposing instead in the representative branch of government. Although there is a difference between social due process and the discredited economic due process of *Lochner, supra,* there is, we think, no real distinction. Both involve values. As Mr. Justice Frankfurter wrote:

> Courts can fulfill their responsibility in a democratic society only to the extent that they suceed in shaping their judgments by rational standards, and rational standards are both impersonal and communicable. Matters of policy, however, are by definition matters which demand the resolution of conflicts of value, and the elements of conflicting values are largely imponderable. Assessment of their competing worth involves differences of feeling; it is also an exercise in prophesy. Obviously the proper forum for mediating a clash of feelings and rendering a prophetic judgment is the body chosen for those purposes by the people.

American Federation of Labor v. American Sash & Door Co., 335 U.S. 538, 557, 69 S.Ct. 258, 267, 93 L.Ed. 222 (1949).

Persuasive, therefore, as the host of statistics, facts and opinions plaintiffs urge upon us appear to be, and as commendable as the efforts plaintiffs have shown in their attempt to right what is considered by many a social wrong are, we must decline what we consider to be an invitation to decide what is best for North Carolina.[5] The legislature is the proper arena for the resolution of "fundamentally differing views." [6]

### II.

■ The plaintiffs also challenge the constitutionality of the residency requirement contained in G.S. § 14–45.1 limiting the availability of therapeutic abortions to those women who have "resided in the State of North Carolina for a period of at least four months immediately preceding the operation being performed except in the case of emergency where the life of the said woman is in danger." The basis of the attack on the constitutionality of this provision is that it unduly infringes upon the fundamental right to travel guaranteed to all citizens. Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1968); United States v. Guest, 383 U.S. 745, 86 S.Ct. 1170, 16 L.Ed.2d 239 (1966). See also, Keenan v. Board of Law Examiners of State of North Carolina, 317 F.Supp. 1350 (E.D.N.C.1970).

The state expresses a fear that has not materialized; taxation of our hospital facilities by an influx of out of state patients seeking abortions. We think our law is not so liberal. But if any protection is needed, the sweep of the provisions in 14–45.1 far exceeds the scope of the interest by penalizing those who enter North Carolina with the bona fide intent of making the state their permanent residence. "[T]he effect of the waiting-period requirement * * * is to create two classes * * * indistinguishable from each other except that one is composed of residents * * *." Shapiro v. Thompson, *supra,* at 627, 89 S.Ct. at 1327.

We conclude that the requirement is overbroad. The interest of the state in maintenance of quality medical treatment for its citizens can be effected without such unnecessary discrimination against other citizens of the United States. In the unlikely event medical facilities should become overtaxed, some fair system of priority, short of flat

---

5. Since the state's interest in the protection of the embryo is sufficient to support the legislation, we need not consider the interest in protecting the mother's health except to say we think that interest is exhausted with the sensible requirement that no unlicensed practitioner may perform an abortion. Apparently, abortions by competent medical doctors within the first three months are no more dangerous to life and health than live births. *See,* People v. Belous, 80 Cal.Rptr. 354, 362, 458 P.2d 194, 200–201 (1969).

6. Holmes, J., dissenting in Lochner, *supra,* at 74, 25 S.Ct. 539.

exclusion of non-residents, may be devised.

## III.

G.S. § 14–44 makes it a felony to willfully administer to any woman who is pregnant or quick with child any substance whatever with intent to destroy *such child*. G.S. § 14–45 is virtually identical but the evil intent proscribed is to procure a miscarriage or injure or destroy *the woman*. The thrust of 14–44 is to protect the unborn child and the thrust of 14–45 to protect the pregnant woman.

G.S. § 14–45.1, enacted in 1967, provides that G.S. §§ 14–44 and 14–45 do not apply when an abortion is performed by a doctor of medicine, licensed in North Carolina, "if he can reasonably establish that":

(1) There is substantial risk that continuation of the pregnancy would threaten the life or gravely impair the health of the woman or;

(2) substantial risk the child would be born with grave physical or mental defect or;

(3) the pregnancy resulted from rape or incest.

The foregoing are the three reasons that will suffice under North Carolina law to make abortion lawful. The rest of 14–45.1 establishes certain procedures that must be followed:

(1) the woman, or if she is a minor or incompetent, someone acting for her, must give her written consent to the abortion;

(2) the abortion must be performed in a hospital licensed by the North Carolina Medical Care Commission;

(3) three doctors must have certified in writing the circumstances they believe to justify the abortion and the certificate furnished to the hospital. There is a provision that in an emergency the certificate may be submitted to the hospital within 24 hours after the abortion.

Although we may not interpret a state statute with finality, for that is the province of North Carolina's highest court, we think the words in G.S. § 14–45.1 authorizing abortion by a medical doctor " * * * if he can reasonably establish that * * *" simply means that the doctor must establish *to his own satisfaction* that one of the three statutory reasons for abortion exists before he may lawfully proceed. We would not lightly assume that the legislature meant to make all abortions unlawful unless in a criminal prosecution the medical doctor could reasonably establish his innocence. The presumption of innocence is deeply rooted in our fundamental law. To read the statute so as to place the burden of proof upon the defendant in a criminal prosecution would offend a maxim implicit in due process—that the accused is presumed innocent until proven guilty. Coffin v. United States, 156 U.S. 432, 453–460, 15 S.Ct. 394, 39 L.Ed. 481 (1895). See also, United States v. Vuitch, 305 F. Supp. 1032, 1034 (D.D.C.1969). The burden of proof must be upon the state to show that the conditions for performing therapeutic abortions, a substantial risk to the life or the health of the mother, or a substantial risk that the child would be born with grave physical or mental defect, or rape or incest, were not present. Due process forbids that the accused be required to establish to the court and jury that the abortion performed *came within the exemptions of the statute.*

We think this was unquestionably the legislative intent, and since the statute can be saved only by such an interpretation, we do not hesitate to put that construction upon it.

An appropriate judgment will be entered declaring the statutes constitutional except for the residency requirement.