ROBERT M. BYRN, as Guardian ad Litem for an Infant "ROE", an Unborn Child, and All Similarly Situated Unborn Infants, Respondent, *v.* NEW YORK CITY HEALTH & HOSPITALS CORPORATION et al., Appellants, et al., Defendants.

Second Department, February 24, 1972.

---

*J. Lee Rankin, Corporation Counsel* (*James Nespole, Leonard Bernikow* and *Yvette Harmon* of counsel), for New York City Health & Hospitals Corporation, appellant.

*Louis J. Lefkowitz, Attorney-General* (*Joel Lewittes* of counsel), appellant in person.

*Hahn, Hahn & Ford* (*Thomas J. Ford* of counsel), for respondent.

*Nancy Stearns, Rhonda Copelon Schoenbrod* and *Kenneth Norwick* for intervenors.

*Thomas J. Dillon* for Supreme Anchor Club of America, Inc., *amicus curiae.*

*Marilyn Elaine Meadors, Edith M. Novack* and *K. Randett Walster* for New Women Lawyers and another, *amici curiae.*

*Carol Bellamy* for National Organization for Women, New York, *amicus curiae.*

*Elizabeth Holtzman* and *Edith M. Novack* for Women's Rights Committee of the New Democratic Coalition, *amicus curiae.*

*Greenbaum, Wolff & Ernst* (*Harriet F. Pilpel, Frederic S. Nathan, Nancy F. Wechsler* and *Ruth Jane Zuckerman* of counsel), for Citizens Committee for Children of New York, Inc., and others, *amici curiae.*

CHRIST, J.  Pursuant to an ex parte order of the Supreme Court, Queens County, entered December 3, 1971, the plaintiff, Robert M. Byrn, was appointed guardian ad litem for the infant " Roe " and all similarly situated members of a class of unborn infants of less than 24 weeks' gestation scheduled for abortion in public hospitals under the operation and control of the defendant New York City Health and Hospitals Corporation (hereinafter called Hospitals Corporation).  The purpose of the appointment was to commence this action for a judgment declaring that subdivision 3 of section 125.05 of the Penal Law is unconstitutional and for a permanent injunction restraining the defendant Hospitals Corporation from performing abortional acts other than those necessary to preserve the life of the female. By order to show cause dated December 3, 1971, the guardian moved for a preliminary injunction pending the trial of the action, restraining the above-mentioned Hospitals Corporation from proceeding with abortions other than those necessary to preserve the life of the female.  The Hospitals Corporation cross-moved for a change of venue and to vacate the guardianship order.

The cross motion was denied and the motion for a preliminary injunction was granted in an order entered January 7, 1972, the Special Term holding that the guardian had established a strong likelihood that he would ultimately succeed in proving that his wards had a constitutionally-protected right to live, that they would be irreparably damaged if a preliminary injunction were denied and that a balancing of the equities was clearly in favor of the unborn infants.  The action was set down for an early trial and the guardian was required to give a $5,000 undertaking.  Defendants Hospitals Corporation and Attorney-General have appealed and the preliminary injunction and the trial have been stayed pending determination of the appeals.

It would be helpful at the outset to trace briefly the legal his-

tory of abortion and its regulation in New York through the years. It is generally believed that abortion of a quick child was a high crime at common law (see, e.g., *Evans* v. *People,* 49 N. Y. 86, 88), although one commentator has argued persuasively that, in fact, it was not; that abortion was a purely ecclesiastical offense punishable only by spiritual penalties and that the secular crime of abortion was created by the imagination of Sir EDWARD COKE who felt strongly that abortion after quickening should be punished and that the purely spiritual penalties of the ecclesiastical courts would not deter the people from it (see, generally, Means, The Phoenix of Abortional Freedom: Is a Penumbral or Ninth-Amendment Right About to Arise from the Nineteenth-Century Legislative Ashes of a Fourteenth-Century Common-Law Liberty? 17 New York Law Forum 335 [1971]).

Whatever the merits of that controversy, New York, by the Laws of 1829, enacted penal provisions making abortion a crime (Rev. Stat. of N. Y., part IV, ch. I, tit. 2, § 9). Every person who administered to a woman pregnant with a quick child any medicine, drug or substance, or used any instrument or other means, with intent to destroy the child, unless it shall have been necessary to preserve the life of the woman, was guilty of manslaughter in the second degree. Procurement of a miscarriage, unless necessary to preserve the life of the mother, was made a misdemeanor (Rev. Stat. of N. Y., part IV, ch. I, tit. 6, § 21).

Preservation of the life of the woman remained the sole justifiable ground for abortion under New York penal statutes and was carried over into subdivision 3 of section 125.05 in the completely revised Penal Law enacted by chapter 1030 of the Laws of 1965, which became effective on September 1, 1967. In the meantime, however, the winds of change had begun to gather force. As indicated in the excellent survey by Professor Richard G. Denzer in his Supplementary Practice Commentary on subdivision 3 of section 125.05 of the Penal Law (McKinney's Cons. Laws of N. Y., Book 39, Pocket Part), 49 of the 52 American jurisdictions (the 50 States, the District of Columbia and Puerto Rico) had criminal abortion statutes in 1965 limiting legal abortions to the single purpose of preserving the life of the prospective mother. In Alabama, Massachusetts and the District of Columbia, preservation of the mother's health was also a ground of justification.

In 1962, however, the American Law Institute published its Model Penal Code and presented an abortion statute extending the justifiable reasons for abortion to include the risk of grave

impairment of the mother's physical or mental health, risk of bearing a child with a grave physical or mental defect, and pregnancy resulting from rape, incest or other felonious intercourse. From 1966 through 1970, 13 sister States (Arkansas, California, Colorado, Delaware, Georgia, Kansas, Maryland, Mississippi, New Mexico, North Carolina, Oregon, South Carolina and Virginia) amended their abortion statutes along the lines suggested in the Model Penal Code. In 1970, Hawaii legalized all abortions of a nonviable fetus performed by a licensed physician.

In January, 1968 Governor Rockefeller appointed an 11 member commission under the leadership of Charles W. Froessel, retired Judge of the Court of Appeals, to study New York's abortion law. The Froessel Commission issued its report in March, 1968. All commission members agreed that abortion to preserve the mother's life is justifiable but a substantial majority found this single ground too limited. It was the majority's view that this lone justification prevented many doctors from practicing what they believed to be good medicine. Many doctors and hospitals had admitted a growing use of "psychiatric indication" of threatened suicide to justify abortions, even though the actual suicide rate of pregnant women was a fraction of that of nonpregnant women "of the same age". Many abortions had been performed on women who had contracted rubella in the first trimester of pregnancy, even though the disease had threatened only the health of the child and not the life of the mother.

The majority found that even if the lowest estimates were used, approximately 200,000 abortions were performed in the United States each year and that the restrictive law created an abortion "racket" operated by doctors without regard for the law or by untrained persons using the most primitive of instruments under the most unsanitary conditions. They also found that the restrictive law unfairly discriminated against the poor, who could not travel to other jurisdictions for safe and legal abortions or pay the price of competent but unethical doctors in this State for either the illegal operation or the "psychiatric indication" to bring it within the color of the law.

While many individuals and groups had urged the adoption of an "abortion on request" statute, the majority of the Froessel Commission recommended that abortion be justified only when certain conditions were satisfactorily demonstrated. Those conditions were: (1) to preserve the life of the woman; (2) to prevent grave impairment of the physical or mental health of the woman; (3) where the woman had a permanent

physical or mental condition which would render her incapable of caring for the child if it were born; (4) where there was a substantial risk that the child, if born, would be so grossly malformed or have such serious physical or mental abnormalities as to be permanently incapable of caring for himself; (5) where the pregnancy resulted from rape in the first degree; (6) where the pregnancy resulted from incest; (7) where the pregnancy began while the woman was unmarried and under 16 years of age and she remained unmarried at the time of the abortional act; and (8) where the woman already had four living children.

Three members of the commission filed a minority report, contending that the child *en ventre sa mere* had constitutional and legal rights to live and that the social consequences of a liberalized abortion law would be an increase in abortions to the point where the abortion rate would virtually outstrip the birth rate, our traditional concept of the sanctity of human life would be diluted, and family values would be eroded.

Bills adopting the commission's recommendations for a liberalized abortion law and endorsed by the Governor were presented to the Legislature in 1968 and in 1969, but failed of passage. In 1970, the Legislature amended subdivision 3 of section 125.05 of the Penal Law to provide that an abortional act is justifiable when committed upon a female with her consent by a duly licensed physician acting (a) under a reasonable belief that such is necessary to preserve her life or (b) within 24 weeks after the commencement of her pregnancy (L. 1970, ch. 127).

It is the position of the guardian ad litem in the instant case that the amended statute violates the constitutional rights of his wards and that the child *en ventre sa mere* is a person protected by the Fifth and Fourteenth Amendments of the Federal Constitution and, as such, cannot be deprived of life without due process or denied the equal protection of New York's laws.

The appellants contend, on the other hand, that the order appointing the guardian was improper, that a fetus of less than 24 weeks' gestation is not a person within the constitutional protections and that a woman has a constitutional right to choose whether to bear a child, which may not be restricted in the absence of a compelling State interest.

CPLR 1201 provides, in relevant part, that " a person shall appear by his guardian ad litem if he is an infant and has no guardian of his property, parent, or other person having legal custody * * * or if he is an infant * * * and the court so directs because of a conflict of interest or for other cause." CPLR 1202 provides, in relevant part, that the court in which

an action is triable "may appoint a guardian ad litem at any stage in the action upon its own initiative or upon the motion of * * * a relative, friend or a guardian or committee of the property" and that notice of a motion for appointment of a guardian ad litem for a person shall be served upon the guardian of his property or upon his committee or, if he has neither, upon the person with whom he resides.

The appellants argue that a fetus is not a "person" and has no rights which a guardian can protect until it is born alive. As the Special Term noted, however, that issue is at the heart of the matter, inextricably woven into the merits of the application for an injunction. In an extraordinary case such as this, where (1) the natural guardians of these unborn children were not likely to appear in their behalf, (2) their termination was imminent and (3) the claim advanced in their behalf was not patently wrong, there was no time to try out the merits before appointing a representative with standing to seek injunctive relief (cf. *Matter of President & Directors of Georgetown Coll.*, 331 F. 2d 1000, 1009–1010 [D. C., 1964], cert. den. *sub nom. Jones* v. *President & Directors of Georgetown Coll.*, 377 U. S. 978).

The appellants argue that the guardian should not have been appointed without notice to the prospective mothers and the putative fathers of the unborn children. There is, however, a manifest conflict of interest between the mother and the fetus about to be terminated. The father's consent to the abortion is not required under the statute and the reasonable inference is that he is either in accord with the mother's wishes or, at least, not effectively opposed. A court is not required to wait for the natural guardians to appear before appointing a guardian ad litem if to do so would constitute a danger to the infant's interests (cf. *Trippe* v. *Trippe,* 35 A D 2d 944; *Matter of Thoms,* 33 A D 2d 990, 991, app. dsmd. 26 N Y 2d 963; *Matter of Beyer,* 21 A D 2d 152, 155).

It is argued that this is not a proper case for a class action because there may be different "defenses" available with respect to a fetus resulting from rape or incest, or a fetus likely to be born with a severe mental or physical defect. At best, this is a claim that the class is overbroad since there must be a number of unborn children in the class not within the reach of these "defenses". Moreover, these "defenses" have never been recognized under prior New York law.

There can be no doubt that the question presented by this action is of a common or general interest to many persons and that those who might be made parties are very numerous, making

it impractical to bring them all before the court. In such a case, one or more may sue or defend for the benefit of all (CPLR 1005, subd. [a]).

It is argued that the class is not sufficiently definite or ascertainable to be legally cognizable. In opposing the motion for a preliminary injunction, the president of Hospitals Corporation asserted that 1,016 abortions were scheduled to be performed within the next two weeks. The precision of that number indicates that the class is adequately defined and clearly ascertainable at any given time.

It is argued that the guardian has been guilty of gross laches in waiting 18 months after the amendment of the statute before seeking this relief. It is clear, however, that the real parties in interest are the unborn infants within the class and that the guardian is merely the vehicle through which their interests are put before the court.

The argument is made that the guardian has no individual standing to challenge the constitutionality of the statute without a showing that he is personally aggrieved. We agree (see, e.g., *St. Clair* v. *Yonkers Raceway,* 13 N Y 2d 72, 76), but find it irrelevant to the case in its present posture.

The intervenors contend that necessary parties, the pregnant women scheduled for abortion in municipal hospitals, were not before the court. It is true that these women might be affected by a judgment in the action (CPLR 1001, subd. [a]), but large numbers of individuals are generally subject to the effect of an action challenging the constitutionality of a State statute. It is clearly impractical to require that each of them be made a party. We see no indication in the record that this objection was presented to the Special Term or considered by it. Nor does the record indicate that any question as to the sufficiency of the guardian's undertaking was presented to or considered by the Special Term. We have already indicated in another context that it would be virtually impossible to evaluate the damages to the parents for rearing an unwanted child as against the denial to them of the benefits of parenthood (*Stewart* v. *Long Is. Coll. Hosp.,* 35 A D 2d 531, app. dsmd. 27 N· Y 2d 804; see, also, *Gleitman* v. *Cosgrove,* 49 N. J. 22, 29–31).

We think, therefore, that the order entered December 3, 1971 appointing the guardian was proper when made. Whether it should have been vacated on the subsequent motion depends on the resolution of the substantive question to which we now turn.

The substantive question presented is whether a fetus of less than 24 weeks' gestation is a person within the protection of the

Fifth and Fourteenth Amendments of the Federal Constitution. We find no factual issues requiring a trial and the parties so conceded on the argument of the appeal. The medical affidavits submitted by the guardian have not been factually disputed and New York courts have already acknowledged that, in the contemporary medical view, the child begins a separate life from the moment of conception (see, e.g., *Endresz* v. *Friedberg,* 24 N Y 2d 478, 485; *Kelly* v. *Gregory,* 282 App. Div. 542, 543–544; *Robin* v. *Incorporated Vil. of Hempstead,* 66 Misc 2d 482, 485–486, revd. on other grounds 38 A D 2d 758).

"The subject of abortions * * * is one of the most inflammatory ones to reach the Court" (*United States* v. *Vuitch,* 402 U. S. 62, 79–80 [DOUGLAS, J., dissenting in part]). It involves the most basic and volatile principles about which men can differ: life, death, liberty, privacy, our traditions, our ideals, our moral values.

In New York, as elsewhere, many of our people are opposed to abortion for a variety of reasons. To the religious anti-abortionists, God is the creator of human life, infusing the soul at conception. This leads them to the conclusion that to abort a pregnancy at any time is to take a human life, to frustrate the will of God. Others opposed on religious grounds would permit abortion only for a proportionately grave reason, e.g., to preserve the life of the mother (Clark, Religion, Morality, and Abortion: A Constitutional Appraisal, 2 Loyola Univ. L.A. L. Rev. 1, 4 [1969]).

Still others oppose abortion on philosophic grounds, believing that all living things are possessed of both actuality and potentiality and are striving to become what they are. He "who destroys germinating life kills a man," as one witness before the Froessel Commission quoted Karl Barth, an eminent theologian, is a philosophic view as well as a religious view. For those who oppose abortion on moral grounds, abortion is evil because it violates a principle of right conduct they deem fundamental, the preservation of all human life. Still others oppose abortion on scientific grounds, believing the embryo or fetus to be a complete biological individual at conception or shortly after, requiring only nourishment and a safe environment to grow and develop. For them, phenomena such as "quickening", viability or birth are merely passing events in the child's life, not rational points to mark the beginning of it.

On the other side of this most inflammatory question, a substantial number of our people regard the amended statute as a decisive but incomplete victory for enlightenment over an

oppressive law which violated a woman's constitutional right to control her own body and intruded into the intimate affairs of the family, marriage and sex without a compelling State interest. They point to the serious public health problem created by the restrictive law which drove women into the illegal market to be aborted by untrained persons using the crudest implements under filthy conditions. Hundreds, if not thousands, of these women are believed to have died as a result. They point to the discriminatory way the former law worked against the poor who could not travel to foreign jurisdictions where abortions were safe and legal and who could not afford the competent but unethical physicians who performed illegal abortions in this State or the psychiatrists who would " verify " the " suicidal tendencies " to bring the procedure within the color of the law. They are appalled by the human misery resulting from the inability of a woman to abort a pregnancy resulting from rape or incest or from a pregnancy likely to produce a child deformed from disease or medication.

We have found no case directly in point which controls our determination. Both sides rely to more or less extent on *Endresz* v. *Friedberg* (24 N Y 2d 478, *supra*), a 1969 Court of Appeals decision holding that a stillborn fetus which died from injuries received *en ventre sa mere* was not a " decedent " within the meaning of New York's wrongful death statute. In the majority opinion, Chief Judge FULD wrote (p. 485) : " In other words, even if, as science and theology teach, the child begins a separate ' life ' from the moment of conception, it is clear that, ' except in so far as is necessary to protect the child's own rights ' * * * the law has never considered the unborn foetus as having a separate ' juridical existence ' * * * or a legal personality or identity ' until it sees the light of day ' ".

It is clear, we think, that the *Endresz* decision does not resolve the case before us. *Endresz* was concerned with the legislative intent underlying New York's wrongful death statute, with problems of causation and damages, and with the rights of the survivors of the unborn child. Moreover, it carved out from the general rule it stated the situation where the law is asked to protect the child's own interests. In the instant case, we are dealing with rights claimed under the Federal Constitution. Causation and damages are not issues and we are being asked to protect the unborn child's own rights, not those of others.

Closer to the mark, we think, are those cases where a pregnant woman, because of her religious beliefs, refuses to avail herself of medical treatment necessary to preserve her life

and/or that of the unborn child. In those cases, the mother asserts a constitutional right to practice freely her particular religious conviction. In the instant case, it is argued that the mother has a constitutional right to privacy under the Ninth Amendment which includes the right to abort an unwanted child (see, e.g., *People* v. *Belous*, 71 Cal. 2d 954, cert. den. *sub nom. California* v. *Belous*, 397 U. S. 915; *City of New York* v. *Wyman*, 66 Misc 2d 402, 416, affd. on other grounds 37 A D 2d 700, revd. 30 N Y 2d 537). The exercise of each of these rights threatens the life of the unborn child. An outsider steps in and asks the court to protect the interests of the child.

*Raleigh Fitkin-Paul Morgan Mem. Hosp.* v. *Anderson* (42 N. J. 421 [1964]) was an action seeking authority for the plaintiff hospital to administer blood transfusions to a prospective mother if they became necessary to save her life and that of the unborn child. The medical indications were that at some point in the pregnancy the mother would hemorrhage severely and that both she and the unborn child would die unless transfusions were administered. The mother, a Jehovah's Witness, did not want the transfusions because they would violate her religious beliefs. The child was " quick ", the pregnancy beyond the 32d week. The New Jersey Supreme Court, reversing the trial court which had held that the judiciary could not intervene in the case of an adult or with respect to the unborn child, held that the unborn child was entitled to the law's protection and that an appropriate order should be made to insure transfusions to the mother if they became necessary. The Supreme Court of the United States denied certiorari (*Anderson* v. *Raleigh Fitkin-Paul Morgan Mem. Hosp.*, 377 U. S. 985).

Similar rulings were made in *Hoener* v. *Bertinato* (67 N. J. Super. 517 [1961]), where the child was to be born within the next few days, and in *Department of Hosp. of City of N. Y.* v. *Martell* (Sup. Ct., N. Y. County, 1969), where the pregnancy was between the eighth and ninth months.

These cases involving compulsory medical treatment do not resolve the question before us in the instant case since the unborn children involved were well beyond the 24-week gestation period provided by our penal statute and, presumably, would be entitled to the same protection under it. These cases do establish, however, that the State has intervened before birth to protect the life of the unborn child endangered by the exercise of a constitutional right asserted by the mother.

In recent years, there have been a number of suits in other jurisdictions challenging restrictive abortion statutes. In *Peo-*

*ple* v. *Belous* (71 Cal. 2d 954, *supra*), the Supreme Court of California held that a penal statute prohibiting abortions other than to preserve the life of the mother was not sufficiently certain to satisfy due process requirements without infringing on a fundamental constitutional right of the mother to choose whether to bear children. The California court inferred the existence of that right from decisions of the Supreme Court of the United States establishing a right of privacy or liberty in matters related to marriage, the family and sex (see, e.g., *Skinner* v. *Oklahoma*, 316 U. S. 535, 541 [right to procreate]; *Griswold* v. *Connecticut*, 381 U. S. 479, 485 [contraception]; *Loving* v. *Virginia*, 388 U. S. 1, 12 [interracial marriage]).

In *Belous*, it was argued that the State has a compelling interest in the protection of the embryo and fetus and that interest warranted limitation of the woman's constitutional right. The California court rejected that argument, stating that the law has always recognized the pregnant woman's right to life as taking precedence over any interest the State might have in the unborn and has traditionally permitted abortion of the child to save her life.

In *Babbitz* v. *McCann* (310 F. Supp. 293 [E. D. Wis., 1970], app. dsmd. *sub nom. McCann* v. *Babbitz*, 400 U. S. 1, injunction granted 320 F. Supp. 219, judgment vacated and case remanded for reconsideration 402 U. S. 903), a three-Judge Federal court held that a Wisconsin statute making it a crime to perform an abortion other than a therapeutic abortion necessary to save the life of the mother was not unconstitutionally vague or a denial of equal protection, but was an unconstitutional invasion of a woman's right to refuse to carry an unquickened embryo during the early months of pregnancy, a right which transcended that of an embryo four months or less.

In *Roe* v. *Wade* (314 F. Supp. 1217 [N. D. Tex., 1970], jurisdiction postponed to hearing on the merits 402 U. S. 941) a three-Judge Federal court held that laws prohibiting abortion except to save the life of the female violated the Ninth Amendment right of a woman to choose whether to have children and were unconstitutionally overbroad and vague. The court did not directly express an opinion on the precedence of the woman's right over that of the unquickened fetus but held that whatever limitations a State might properly place on that right, the Texas statute had gone far beyond by barring all abortions other than those to save a woman's life.

Similar holdings were made in *Doe* v. *Bolton* (319 F. Supp. 1048 [N. D. Ga., 1970], jurisdiction postponed to hearing on the

merits 402 U. S. 941 [1971]) and in *Doe* v. *Scott* (321 F. Supp. 1385 [N. D. Ill., 1971], appeals filed *sub nom. Hanrahan* v. *Doe*, 39 U. S. L. Week 3438 [U. S., Mar. 29, 1971]).

In *United States* v. *Vuitch* (305 F. Supp. 1032 [D.D. C., 1969], revd. 402 U. S. 62) the Supreme Court of the United States reversed a determination that the District of Columbia abortion statute was unconstitutionally vague. That statute made criminal any abortions other than those necessary for the preservation of the life or health of the mother. The District Court had also observed that " as a secular matter a woman's liberty * * * may well include the right to remove an unwanted child at least in early stages of pregnancy " (p. 1035). The Supreme Court refused to pass on that question, limiting its decision to the question of vagueness.

Other three-Judge Federal courts have upheld restrictive abortion statutes. In *Rosen* v. *Louisiana State Bd. of Med. Examiners* (318 F. Supp. 1217 [E. D. La., 1970], appeal filed 39 U. S. L. Week 3302 [U. S., Nov. 27, 1970]), a doctor challenged the constitutionality of a Louisiana statute authorizing the suspension or revocation of a medical doctor's certificate when the doctor has committed or participated in an abortion, unless it was necessary to the relief of a woman whose life appeared in peril. The court dismissed the action, holding that it was the policy of the Louisiana abortion statute that whatever interests the mother or others might have in terminating the pregnancy must be subordinated to allow the fetus an opportunity to develop toward natural birth, that Louisiana was empowered to place such value upon prenatal life and that preference of a pregnant woman's interest over that of the unquickened embryo is not mandated by the Federal Constitution.

In *Steinberg* v. *Brown* (321 F. Supp. 741, 746–747 [N. D. Ohio, 1970]), the three-Judge court upheld a restrictive abortion statute and stated that once human life has commenced, the constitutional protections found in the Fifth and Fourteenth Amendments impose upon the State the duty of safeguarding it.

In *Corkey* v. *Edwards* (322 F. Supp. 1248 [W. D. N. C., 1971], appeal filed 40 U. S. L. Week 3098 [U. S. July 17, 1971]), a three-Judge court upheld a restrictive abortion statute, holding that the weight to be accorded the interests of the unborn child and those of its mother " is a value judgment not committed to the discretion of judges but reposing instead in the representative branch of government " (p. 1254).

A restrictive statute was also upheld by a three-Judge court in *Doe* v. *Rampton* (No. C-234-70; D. Utah, filed Sept. 8, 1971).

The appellants contend that *Montana* v. *Rogers* (278 F. 2d 68 [7th Cir., 1960]) is authority that an unborn child is not a person within the protection of the Fourteenth Amendment. We disagree. That case, a declaratory judgment action to determine citizenship, merely held that the Fourteenth Amendment limits citizenship to persons " born " in the United States. The plaintiff had been conceived in the United States but was born in Italy. In the instant case, however, we are concerned not with citizenship but with the rights to due process and equal protection guaranteed to all persons by the Fourteenth Amendment, citizens or not (see, e.g., *Yick Wo* v. *Hopkins,* 118 U. S. 356, 369).

It is true that at common law the infant *en ventre sa mere* was recognized and a legal personality imputed to it as a rule of property for all purposes beneficial to it, but that imputation was regarded as a benevolent fiction granted in anticipation of the child's birth (*Drobner* v. *Peters,* 232 N. Y. 220, 222–224). New York did not accord a right of recovery to the child for injuries received in the womb until 1951 when it abandoned *Drobner* in *Woods* v. *Lancet* (303 N. Y. 349). Even in that case, however, the holding was confined to the viable unborn child and, if the child died in the womb, the right died with it. The right was extended to injuries to the nonviable unborn child in 1953 in *Kelly* v. *Gregory* (282 App. Div. 542, 544–545), still subject to the requirement that the child be born alive. In 1957, the Court of Appeals declined to extend the rationale of *Woods* and *Kelly* to the fatal injury of a fetal child (*Matter of Logan,* 3 N Y 2d 800, 801) and adhered to that rule in the 1969 case of *Endresz* v. *Friedberg* (24 N Y 2d 478, *supra*). In 1959, the Court of Appeals held that a child *en ventre sa mere* was not a person beneficially interested in a trust whose consent was required for revocation of the trust, holding that such a child was not regarded as a person until it sees the light of day (*Matter of Peabody* [*Chase Manhattan Bank — Holtzmann*], 5 N Y 2d 541, 547).

These later determinations by the Court of Appeals cannot be explained away on the theory that advanced medical and biological information regarding the unborn child was unknown to it. They reflect instead the view that legal personality is not synonymous with separate and vital existence within the womb; that, depending on the circumstances involved, public policy and other factors, legal personality will be accorded or withheld as these extrinsic considerations demand.

Our criminal law has not uniformly protected the infant *en ventre sa mere.* The destruction of the unquickened fetus was not manslaughter at common law (*Evans* v. *People,* 49 N. Y. 86).

At common law a pregnant female sentenced to death was executed unless the child had quickened. The same provision exists under our present law (Correction Law, §§ 659, 660). Under the newly-revised Penal Law, in effect since September, 1967, a " person " is defined as " a human being who has been born and is alive " and conduct causing the death of an unborn child of less than 24 weeks' gestation is not homicide (Penal Law, § 125.05, subd. 1, § 125.00).

We have seen no indication that the framers of the Fifth Amendment intended to include fetal life when they provided that no " person " shall be deprived of life without due process. In construing a constitution or any part of it, a court should look to the law as it existed at the time it was adopted (*Mattox* v. *United States*, 156 U. S. 237, 243). It has been said that our Federal Constitution should be construed with reference to the common law of England (*Dimick* v. *Schiedt*, 293 U. S. 474, 476) and that without reference to that common law, the language of the Federal Constitution could not be safely interpreted (*Matter of Grossman*, 267 U. S. 87, 108–109). As indicated earlier, it was generally believed at common law that the unborn child was physically a part of the mother and legal personality was accorded to it merely as a fictional device in anticipation of birth. We think it unlikely, therefore, that the framers of the Fifth Amendment, dealing with an amendment concerned with criminal trials, the need for indictment, protection against double jeopardy, and loss of life, liberty or property without due process, gave any consideration to whether a child *en ventre sa mere* was within the protection of that amendment.

The decisive consideration for us in resolving the instant case is that state statutes come before the court with a strong presumption of constitutionality, including a rebuttable presumption of the existence of necessary factual support for their provisions. Questions of wisdom, need or appropriateness are for the Legislature and we strike down statutes it has enacted only as a last resort and only when unconstitutionality is shown beyond a reasonable doubt (*Matter of Van Berkel* v. *Power*, 16 N Y 2d 37, 40; *Paterson* v. *University of State of N. Y.*, 14 N Y 2d 432, 438, and cases there cited). No such showing has been made in the instant case.

In our opinion, subdivision 3 of section 125.05 of the Penal Law is constitutional and violates no right of the unborn children represented by the guardian. A state has broad power to make classifications and, while it may not draw a line which constitutes an invidious discrimination, the test in the end is whether

the line drawn is a rational one (*Levy* v. *Louisiana,* 391 U. S. 68, 71). Whether the line in this case could or should have been marked at some other place along the path of gestation is surely arguable, but we do not think the achievement of viability, the capacity of the fetus to survive outside the womb, is an irrational distinction (cf. *Endresz* v. *Friedberg,* 24 N Y 2d 478, 486, *supra*).

When called upon to determine the validity of a duly-enacted statute, the court is concerned with " the powers of government inherent in every sovereignty " (*Thurlow* v. *Massachusetts,* 5 How. [46 U. S.] 504, 583). We may interfere with the exercise of that plenary power only to the extent the Constitution requires (*Poe* v. *Ullman,* 367 U. S. 497, 539 [HARLAN, J., dissenting]). In resolving the important issues presented by this case, this court is not required to weigh and choose between the competing values urged by those who support the law and those who oppose it. The Legislature has made that determination and the court inquires only whether the Federal Constitution permits the choice it made and whether there is a reasonable basis for it. We answer both questions in the affirmative. In our opinion, the extent to which fetal life should be protected " is a value judgment not committed to the discretion of judges but reposing instead in the representative branch of government " (*Corkey* v. *Edwards,* 322 F. Supp. 1248, 1253–1254 [W. D. N. C., 1971], *supra*).

We see no issues of fact requiring a trial. Accordingly, the order entered January 7, 1972 should be reversed, on the law, without costs, the motion for a preliminary injunction denied and the cross motion to vacate the order appointing the guardian ad litem granted; and the case should be remanded to the Special Term for entry of a judgment in favor of the defendants declaring the rights of the parties in accordance with this opinion (*Lanza* v. *Wagner,* 11 N Y 2d 317, 334, app. dsmd. 371 U. S. 74).

GULOTTA, J. (dissenting in part). All we have before us on these appeals is the question of the propriety of the preliminary injunction which was granted, plus the question of whether there was justification for the appointment of a guardian.

I agree that the strong presumption of constitutionality which supports the new subdivision 3 of section 125.05 of the Penal Law was sufficient to defeat the motion for a preliminary injunction and that it was improvidently granted. However, I disagree that the guardian's work is done and that he should now be discharged.

It is true that, although no motion for summary judgment was made by either side at the Special Term, it was conceded on the

argument before us that there were no issues of fact to try. However, it seems to me that this is so only with respect to the immediate factual basis for the lawsuit itself. It is not so with respect to the factual foundation which was developed before the Legislature and relied upon by it to support the amendments in the abortion law which it finally enacted. This basic issue remains open.

We all have our personal beliefs and a philosophy of life, but a Judge must apply the law as he finds it, whether it supports his beliefs or not. Viewed from this posture, in the light of settled constitutional law, I must find the extreme position of the plaintiff to be legally untenable. His contention is that the new legislation is void and unconstitutional on its face, because he deems it beyond the Legislature's power to adopt *any* regulations in this field short of absolute prohibition (except, of course, to preserve the mother's life), regardless of the serious problems which have been graphically delineated in the majority opinion. He has overlooked the very real, all important and challenging question which does exist, viz., whether there was a rational basis for the legislative enactment which was adopted by the lawmakers.

The majority concedes this question to be implicitly involved in this case, but concludes that there has been no showing made which would warrant inquiring into and examining that phase of the matter.

Since at this juncture there has been no trial, or even a motion for summary judgment, there has been no opportunity to make such a presentation, and a final judgment, now, precludes there ever being one. While giving full recognition to the heavy burden resting on anyone who challenges a law on constitutional grounds, it does no violence to that principle, in my opinion, to require the State, when it takes away a life by law, to take the initiative to justify the act, although the ultimate burden of proof may remain unaltered.

Putting aside metaphysical concepts of soul infusion and the semantic question as to when a fetus becomes a human being, unquestionably it is an inchoate human being well along in its development at six months, sufficient, I think, to make out a prima facie case for continuing its life and sufficient to rebut the presumption that there was a rational basis for legislation which would take it away. In other words, the gravity of what is being done puts an end to the presumption and we are entitled to hear and evaluate the merits of the State's position.

While it is customary to take a plaintiff at his word, in a case of such transcendent importance as this one is to the people of the entire State, and where the plaintiff is merely their representative in a class action, I believe that in good conscience we should not accept the plaintiff's concession that there are no triable issues.

The Froessel Commission's report, which appears to be the source of the 24-week viability test adopted by the Legislature as the outside limit for elective abortion, certainly furnished a rational basis for not going beyond that point, but it is by no means self-evident to me that there is a rational basis for waiting that long. Situations readily come to mind which might justify waiting beyond the first trimester to terminate a pregnancy, e.g., a late contraction of German measles by the mother causing a crippling malformation or mental defect in the fetus or an amniocentesis test for mongolism which proves positive after 18 weeks, etc., but I have seen no rational basis advanced or even alluded to for waiting six months for a purely elective abortion. Certainly it is nowhere recommended in the commission's report.

I think a court must reject both extreme views which have been advanced. On the one hand, it cannot accept the concept that a woman, with or without State approval, may not under *any* circumstance terminate a pregnancy immediately after fertilization of an ovum because the chromosomal blueprint is present in that individual embryo. On the other hand, neither can I accept the reasoning that a 24-week fetus, which is in fact an almost fully formed baby with all its limbs and all its organs, has no standing to invoke the intervention of the court to save its life even if there be no compelling, rational reason to abort it.

That the founding fathers may not have been thinking specifically of infants *en ventre sa mere* when they adopted the Fifth Amendment to the Federal Constitution or that their successors may not have been mindful of that when they adopted the Fourteenth Amendment does not preclude our doing so; and in fact this was done with respect to a 32-week fetus in *Raleigh-Fitkin-Paul Morgan Mem. Hosp.* v. *Anderson* (42 N. J. 421, cert. den. *sub nom. Anderson* v. *Raleigh Fitkin-Paul Morgan Mem. Hosp.*, 377 U. S. 985). I agree with that decision and with a similar ruling made with respect to late pregnancies in *Hoener* v. *Bertinato* (67 N. J. Super. 517).

The line of Federal cases which are almost equally divided on the constitutional right of a woman to determine whether to continue a pregnancy in its early stages in spite of State laws

which purported to *deny* her that right is of limited usefulness to us here, where New York has *accorded* the right, and the challenge is whether it is unconstitutional to recognize it, rather than unconstitutional to take it away.

In sum, I would allow this case to proceed to trial, to ascertain whether in the light of current scientific and medical knowledge, and the sociological and economic problems with which the Legislature had to deal, there was a rationally sustainable basis for the course it took.

RABIN, P. J., LATHAM and SHAPIRO, JJ., concur with CHRIST, J.; GULOTTA, J., dissents in part, in an opinion.

Order of the Supreme Court, Queens County, entered January 7, 1972, reversed, on the law, without costs; plaintiff's motion for a preliminary injunction denied; cross motion of defendant New York City Health & Hospitals Corporation to vacate an order of the same court, entered December 3, 1971, granted; and case remanded to the Special Term for entry of a judgment in favor of defendants declaring the rights of the parties.