Jane POE et al., Plaintiffs,

v.

Frank D. MENGHINI, Wyandotte County Attorney, and all others similarly situated, Defendants.

Civ. A. No. KC–3411.

United States District Court,
D. Kansas.

March 13, 1972.

**988**

Roy Lucas, New York City, Frederick K. Cross, Kansas City, Kan., Herbert Horowitz, Kansas City, Mo., and Hart-

zell J. Whyte, Kansas City, Kan., for plaintiffs.

Frank D. Menghini, Wyandotte County Atty., and David P. Mikesic, Asst. County Atty., Kansas City, Kan., for defendants.

Before HILL, Circuit Judge, BROWN and THEIS, District Judges.

## OPINION AND ORDER OF THE COURT

THEIS, District Judge.

Several years ago, the Kansas Legislature recognized that many Kansas criminal statutes were archaic and obsolete and that a complete modernization of the Criminal Code was required. Accordingly, the Kansas Judicial Council was commissioned to study and update the Criminal Code and report its findings to the Legislature. In 1969, the Legislature, acting upon the recommendations of the Judicial Council, enacted the new Kansas Criminal Code. One provision of this Code substantially liberalized the circumstances under which a woman could obtain an abortion.[1] Modeled on the provision suggested by the Model Penal Code,[2] K.S.A. 21–3407 permits an abortion when the following circumstances exist:

1. Continuance of the pregnancy would impair the physical or mental health of the mother;

2. The child would be born with a physical or mental defect;

3. The pregnancy resulted from rape, incest, or other felonious intercourse.

In addition to the suggested procedural requirement that three physicians certify in writing their belief in the justifying circumstances, the Legislature, for reasons known only to itself, added an additional procedural requirement. The Legislature provided in Section 2(a) of the statute that abortions could be per-

---

1. Former statute, K.S.A. 21–437, permitted an abortion only when necessary to preserve the life of the mother.

2. Model Penal Code § 230.3 (Proposed Official Draft, 1962).

formed only in state-licensed hospitals accredited by the Joint Commission on Accreditation of Hospitals (hereinafter referred to as "JCAH").

Following the effective date of the statute, Dr. Weller, in conjunction with the Douglass Hospital, established a therapeutic abortion program which provided family planning counseling, as well as abortion services. The Douglass Hospital in 1970 was not JCAH-accredited, although it previously had been. Otherwise, all the statutory requirements were fully complied with by the Douglass Hospital. During the period of September, 1970, to July, 1971, some 2,-000 abortions were performed by Dr. Weller at the Douglass Hospital. On July 28, 1971, the defendant notified the Douglass Hospital by letter that it was in violation of K.S.A. 21–3407, because it was not JCAH-accredited. The Douglass Hospital, fearing prosecution, immediately ceased performing abortions.

Plaintiffs, Jane Poe and Sally Poe, are women who, at the time this action was commenced, were in need of abortions and had allegedly met all the statutory prerequisites. But, due to the limited facilities available and to the restrictive policies of local hospitals, they assert they have been unable to procure abortions. There appear to be only 80 state-licensed hospitals in Kansas accredited by JCAH out of a total of 169.[3] However, all plaintiffs state that were it not for the procedural restrictions imposed by K.S.A. 21–3407, the two female plaintiffs could have obtained abortions at Douglass Hospital. Believing the JCAH-accreditation requirement and the three-physician requirement to infringe upon fundamental rights to individual and marital privacy guaranteed by the United States Constitution, plaintiffs filed this action attacking the constitutionality of these provisions of K.S.A. 21–3407. K.S.A. 65–444 is also attacked, since it incorporates and implements the objectionable provisions of K.S.A. 21–3407. Plaintiffs request a declaratory

judgment and appropriate injunctive relief.

This action is maintained by plaintiffs both as individuals and as representatives of a class. Jurisdiction is invoked under 28 U.S.C.A. §§ 1331, 1343(3), 2201 and 42 U.S.C.A. § 1983. Actually, there are three subclasses. Plaintiffs Jane Poe and Sally Poe purport to represent all female patients who are now or will in the future seek abortions. Dr. Weller represents all physicians who are prevented from caring for patients because of the restrictive provisions of K. S.A. 21–3407. The Douglass Hospital represents all state-licensed hospitals who are not JCAH-accredited.

Plaintiffs' motion for a temporary restraining order was heard on September 24, 1971, by Chief Judge Brown, who denied the motion. However, since a state statute of statewide application was being challenged as contrary to the Constitution of the United States, he did initiate procedures for convening a three-judge court pursuant to 28 U.S.C.A. § 2281. Board of Regents, etc. v. New Left Education Project, 404 U.S. 541, 92 S.Ct. 652, 30 L.Ed.2d 697 (1972). On October 1, 1971, the three-judge court was ordered convened and on October 20, 1971, arguments were heard. On the basis of those arguments and on the affidavits and briefs on file, the provisions of K.S.A. 21–3407 requiring certification of the circumstances by three physicians and limiting performance of the procedure to JCAH-accredited hospitals, are found by this Court, for reasons to be discussed at length, to be in violation of the Due Process and Equal Protection Clauses of the Fourteenth Amendment; however, these objectionable provisions may be severed from the statute without perverting its ultimate purpose.

Before proceeding to the substantive considerations, there are certain procedural aspects which demand consideration. As previously noted, this action purports to be a class action. Rule 23 of the Federal Rules of Civil

3. Moreover, out of 69 county hospitals only 15 are JCAH-accredited.

Procedure sets out the criteria which must be satisfied before a class action may be maintained. In general, class actions have been favorably viewed by the courts.[4] They are especially efficacious in actions such as this where there is a common question of law and relief is sought with respect to the class as a whole. It plainly appears from the affidavits that joinder of all members of the class would be impracticable. Indeed, it is doubtful the members of the class are capable of "specific enumeration,"[5] and hence a class action is particularly apropos. This is, in fact, the type of action which is contemplated by Rule 23(b)(2), F.R.Civ.P., since defendant Menghini has acted on grounds generally applicable to all members of the class and final injunctive or declaratory relief with respect to the whole class will be appropriate. Maintenance of the instant case as a class action is not only proper in this case, but also will effectuate the "interests both of judicial administration and of justice."[6]

■ Regardless of whether the action is maintained as a class action or as a private action, plaintiffs must demonstrate to the satisfaction of this Court that their claims meet the basic jurisdictional requirements of Article III and of 28 U.S.C.A. § 2201. These jurisdictional requirements embrace two distinct elements. First, the parties must have the requisite standing and, second, they must present a justiciable issue. Golden v. Zwickler, 394 U.S. 103, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969); Flast v. Cohen, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). The standing requirement is satisfied where, after an examination of the substantive claims, there appears to be a "logical nexus between the status asserted [by a plaintiff] and the claim sought to be adjudicated." Flast v. Cohen, supra, 392 U.S., at 102, 88 S.Ct., at 1953. A justiciable controversy exists where plaintiffs with a personal stake and interest are arrayed against persons with adverse legal interests in a sufficiently immediate adversary context to warrant declaratory relief. Golden v. Zwickler, supra. It is not necessary that plaintiffs have violated the statute or that a prosecution be pending before the constitutionality of a statute may be challenged, so long as actual interference with fundamental rights is alleged or is shown. Grossen v. Breckenridge, 446 F.2d 833 (6th Cir.1971); Doe v. Dunbar, 320 F.Supp. 1297 (D.Colo.1970).

■ By this time, it is almost beyond question that Jane Poe and Sally Poe have the requisite standing.[7] The fact that they cannot be prosecuted under K.S.A. 21–3407 is of no consequence, since they allege the statute infringes on their fundamental rights of individual and marital privacy. See Epperson v. Arkansas, 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968). Plaintiffs Weller and Douglass Hospital have standing for the reason that if they perform abortions or permit them to be performed in accordance with their convictions about the fundamental right of a woman to determine whether to have children and to seek medical assistance, they will subject themselves to possible criminal liability.[8]

4. Bowe v. Colgate-Palmolive Co., 416 F.2d 711 (7th Cir. 1969); Jenkins v. United Gas Corp., 400 F.2d 28 (5th Cir. 1968); Oatis v. Crown Zellerbach Corp., 398 F.2d 496 (5th Cir. 1968); Gerstle v. Continental Airlines, Inc., 50 F.R.D. 213 (D.Colo. 1970).

5. Yaffe v. Powers, 454 F.2d 1362 (1st Cir. 1/26/72).

6. WRIGHT, LAW OF FEDERAL COURTS § 72 (2d Ed. 1970).

7. In every case wherein an abortion statute has been challenged by women claiming to have been denied an abortion, the requisite standing has been found to exist. See, e. g. Abele v. Markle, 452 F.2d 1121 (2nd Cir. 12/13/71); Crossen v. Breckenridge, 446 F.2d 833 (6th Cir. 1971). In addition, see the cases cited infra at n. 19 and n. 20.

8. Dr. Weller also has standing to assert the rights of his female patients. Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965).

Doe v. Dunbar, supra; Roe v. Wade, 314 F.Supp. 1217 (N.D.Tex.1970).

The requisite controversy, apart from a continuing infringement on fundamental rights, is supplied by defendant Menghini's letter dated July 29, 1971, in which he advises the Douglass Hospital "to cease performing abortions immediately." Plaintiffs allege they ceased performing abortions only because they feared prosecution should they continue. The imminency of prosecution is buttressed by plaintiffs' evidence tending to show an ongoing investigation from March, 1971, carried on by the defendant and members of his staff. Part of this investigation, according to the plaintiffs, included harassment and coercion of patients leaving the hospital. A threat of prosecution, when accompanied by acts such as those described in plaintiffs' affidavits, unquestionably gives rise to a real, immediate and substantial controversy.

However, since plaintiffs are challenging the constitutionality of a state statute, it might be proper for this Court to decline to exercise its jurisdiction and abstain from rendering a decision on the merits of plaintiffs' contentions. Most of the federal courts which have been asked to rule on the constitutionality of a state abortion statute have declined to abstain, and seemingly, the question ought to be considered settled. But a recent series of Supreme Court decisions dealing with the propriety of abstention in certain cases compel a re-analysis of the propriety of abstention in the instant case. In Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), and in Samuels v. Mackell, 401 U.S. 66, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971), the Supreme Court established that ordinarily neither injunctive nor declaratory relief was available to a person in federal court against criminal proceedings pending in a state court, absent a showing that there was a great

and immediate threat of irreparable harm and that the threat could not be eliminated by defense against the criminal proceeding.[9] In *Younger*, the Supreme Court expressly reserved the question of whether the same standard was applicable where a state prosecution was merely threatened, but not yet commenced.

That question is squarely presented by this case. Apparently the standards announced in *Younger*, and its companion cases, do not apply where prosecution is only threatened. The First Circuit Court of Appeals, when presented with the same question, concluded that:

"There is a clear and significant difference in the appropriateness of federal relief between pending and pre-prosecution contexts. The policies militating against intervention, canvassed in Younger v. Harris, do not apply to all or apply with greatly diminished strength in the latter context. The traditional restraint of equity, calculated to prevent erosion of the role of the jury and avoid a duplication of legal proceedings is not here present. And considerations of comity do not push nearly so strongly where there is no ongoing state proceeding to be aborted. Wulp v. Corcoran, 454 F.2d 826 (1st Cir. 1/11/72).

In *Wulp*, the Circuit Court considered only the propriety of a declaratory judgment; the question of what standards govern the issuance of an injunction where a state prosecution is threatened in view of the *Younger* decision, is presently unresolved. This being the case, the Court considers that the request for a declaratory judgment must still be decided independently of the request for injunctive relief. Zwickler v. Koota, 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967). Accordingly, determination of whether injunctive relief is warranted under the facts will be reserved for the moment.

9. To the same effect see: Boyle v. Landry, 401 U.S. 77, 91 S.Ct. 758, 27 L.Ed.2d 696 (1971); Dyson v. Stein, 401 U.S. 200, 91 S.Ct. 769, 27 L.Ed.2d 781 (1971); Perez v. Ledesma, 401 U.S. 82, 91 S.Ct. 674, 27 L.Ed.2d 701 (1971); Byrne v. Karalexis, 401 U.S. 216, 91 S.Ct. 777, 27 L.Ed.2d 792 (1971).

■ Since Younger v. Harris, supra, has no bearing on the question of abstention here, the standard to be applied is that recently reiterated in Wisconsin v. Constantineau, 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971), which reaffirmed the Supreme Court's prior determination in Zwickler v. Koota, supra. Under the standard announced in these cases, this Court should abstain only if the state statute is ambiguous and hence a definitive state court interpretation might remove the federal constitutional claim. The two provisions which this Court is being called upon to declare unconstitutional are not ambiguous. No questions of state law which would remove the federal constitutional claim are discernible. The plaintiffs simply assert the provisions are inconsistent with the Federal Constitution. There being no apparent reason to abstain, the Court may proceed to decide the merits of plaintiffs' claims.

Plaintiffs challenge the two provisions of K.S.A. 21–3407, and incidently K.S.A. 65–444, principally because they arbitrarily classify therapeutic abortion procedures apart from other medical procedures, and thereby infringe upon fundamental personal rights of the plaintiffs guaranteed by the First, Ninth and Fourteenth Amendments. Before considering whether the classification made by the statute can be upheld as a legitimate exercise of the state's police power, there is a threshold question of whether or not there is a fundamental right of privacy which embraces the right to obtain an abortion.

Even though not specifically mentioned in the Constitution, an individual has long been recognized to have retained his right to individual autonomy and privacy and that this right carries over into the marital relationship. Consequently, the Supreme Court has recognized the existence of a right to care for one's own health,[10] to personal autonomy,[11] to marry,[12] to have offspring,[13] to use contraceptives,[14] to direct the upbringing and education of one's children,[15] as well as the right to travel.[16] Plaintiffs' assertion that women have a fundamental right to procure an abortion, although drawing support from all of these enumerated rights, rests basically on the Supreme Court decision in Griswold. That the zone of privacy described in Griswold encompassed the right to seek and procure an abortion was suggested by Justice Clark when he wrote of Griswold and its predecessors that:

"The result of these decisions is the evolution of the concept that there is a certain zone of individual privacy which is protected by the Constitution. Unless the State has a compelling subordinating interest that outweighs the individual rights of human beings, it may not interfere with a person's marriage, home, children, and day-to-day living habits. This is one of the most fundamental concepts that the Founding Fathers had in mind when they drafted the Constitution."[17]

He went on to say:

"Procreation is certainly no longer a legitimate or compelling State interest

10. Jacobson v. Massachusetts, 197 U.S. 11, 25 S.Ct. 358, 49 L.Ed. 643 (1904).

11. Union Pac. Ry. Co. v. Botsford, 141 U.S. 250, 11 S.Ct. 1000, 35 L.Ed. 734 (1890).

12. Loving v. Commonwealth, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967) (alternative ground of decision); Meyer v. Nebraska, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1922).

13. Skinner v. Oklahoma ex rel. Williamson, 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942).

14. Griswold v. Connecticut, supra, note 8.

15. Pierce v. Society of Sisters, etc., 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925).

16. United States v. Guest, 383 U.S. 745, 86 S.Ct. 1170, 16 L.Ed.2d 239 (1966). In Corkey v. Edwards, 322 F.Supp. 1248 (W.D.N.C.1971), a residency requirement made a part of the North Carolina abortion statute was held unconstitutional as an infringement on the right to travel.

17. Clark, Religion, Morality, and Abortion: A Constitutional Appraisal, 2 Loyola U.L.R. 1, 8–9 (1969).

in these days of burgeoning populations. Moreover, abortion falls within that sensitive area of privacy—the marital relation. One of the basic values of this privacy is birth control, as evidenced by the *Griswold* decision. Griswold's act was to prevent formation of the fetus. This, the Court found, was constitutionally protected. If an individual may prevent conception, why can he not nullify that conception when prevention has failed?"[18]

Recently, a number of federal courts have had occasion to consider and decide whether this asserted right is indeed constitutionally protected. As might be expected when a question so fraught with moral, religious and philosophical overtones is presented, the results have been conflicting. Several courts have denied the existence of such a right.[19] However, a majority have recognized the right exists, although it may be subject to limitations necessitated by a compelling state interest.[20] Like the majority, this Court is convinced of the existence of a fundamental right to individual and marital privacy which includes within its scope the right to procure an abortion; but we also recognize that the right is not without some limitations. The root question then, is one of balancing the individual interest against the state interest.[21]

Unquestionably, the State of Kansas has and will continue to have the duty and power to protect its children.[22] In the context of the factual situation confronting the Court, the state interest primarily concerned is its interest in assuring that the decision to abort is soundly based and is arrived at only after consideration of all alternatives. Doe v. Bolton, 319 F.Supp. 1048 (N.D.Ga. 1970). Also involved is the state's interest in protecting and preserving the health and welfare of the mother. These two areas of interest encompass a number of considerations, for example, guarding against the establishment of "abortion mills." Against these legitimate state interests, the Court must weigh the individual rights possessed by the plaintiffs.

The first provision of K.S.A. 21-3407 challenged, provides that the abortion be performed in a hospital accredited by the JCAH. Overall, the effect of this provision has been to significantly limit the number of hospitals which may permit the use of their facilities for the performance of abortions. At the present time only 80 of 169 hospitals in Kansas are JCAH-accredited. So substantial a limitation of facilities constitutes a significant encroachment upon the exercise of a fundamental right. Thus, if the provision is to be sustained, it must be shown to bear a necessary and reasonable relationship to a compelling state interest and its scope must be restricted to furthering that interest.[23] Apparently, the primary compelling state interest to be served by this provision is its interest in insuring that abortions are performed by competent physicians and in adequate facilities. Roe v. Wade, supra. Any possible relation to

18. *Id.* at 9.

19. Steinberg v. Brown, 321 F.Supp. 741 (N.D.Ohio 1970) ; Rosen v. Louisiana State Bd. of Medical Examiners, 318 F. Supp. 1217 (E.D.La.1970).

20. Corkey v. Edwards, 322 F.Supp. 1248 (W.D.N.C.1971) ; Doe v. Scott, 321 F. Supp. 1385 (N.D.Ill.1971) ; Doe v. Bolton, supra; Roe v. Wade, 314 F.Supp. 1217 (N.D.Tex.1970) ; Babbitz v. McCann, 310 F.Supp. 293 (E.D.Wis.1970) ; United States v. Vuitch, 305 F.Supp. 1032 (D.D.C.1969) ; People v. Belous, 71 Cal. 2d 954, 80 Cal.Rptr. 354, 458 P.2d 194 (1969).

21. Doe v. Bolton, 319 F.Supp. 1048 (N.D. Ga.1970) ; Clark, supra, at note 17.

22. Shelton v. Tucker, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960) ; Prince v. Massachusetts, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944).

23. McLaughlin v. State of Florida, 379 U.S. 184, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964) ; Bates v. City of Little Rock, 361 U.S. 516, 80 S.Ct. 412, 4 L.Ed.2d 480 (1960) ; Thornhill v. Alabama, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940).

the quality of the decision-making process escapes us.

■ When the constitutional criteria are applied, the constitutionality of requiring JCAH-accreditation becomes, at best, dubious. In the first place, the JCAH has never been concerned with the content of medical practice, rather, the standards promulgated by it are addressed to:

"The safety and maintenance of the physical plant of the hospital; to the organization and functioning of the governing authority and its medical staff; to the provisions of adequate and efficient space, equipment, and personnel for the necessary diagnostic and therapeutic resources; and the continuing exercise of appropriate controls to assure effective performance."

Indeed, the Commission has refrained from promulgating any policies regarding abortion or abortion procedures. So, while JCAH accreditation may help to insure the adequacy of personnel and facilities, it has no bearing on a hospital's abortion policy nor does it contribute to the decision-making process.

Second, the provision singles out and classifies the abortion procedure apart from all other medical procedures. There appears to be no basis in fact for this differentiation. Plaintiffs' evidence indicates that the abortion procedure is among the safest of surgical procedures.[24] There is no plausible reason for restricting abortions to JCAH-accredited hospitals when any state-licensed, but non-accredited, hospital is permitted to perform any number of high risk procedures. JCAH-accreditation provides no more concrete assurance that abortion procedures will be performed in adequate facilities and by competent personnel than does state-licensure, which is likewise a requirement of K.S.A. 21-3407. In this respect, then, the JCAH-accreditation provision, although it advances a legitimate state interest, is overbroad, since it curtails the exercise of a constititionally protected right when the state interest purportedly served can be fully protected by a less restrictive requirement—state licensure. The JCAH-accreditation provision of K.S.A. 21-3407 places an unwarranted limitation upon the exercise of a fundamental right and is, therefore unconstitutional.

This provision suffers from a second constitutional defect. The JCAH is a private, non-profit corporation with headquarters outside the State of Kansas. To this private concern the Kansas Legislature has delegated the power to promulgate standards binding on Kansas hospitals, at least if therapeutic abortions are to be performed in their facilities. In the event an unaccredited hospital, such as the Douglass Hospital, lends its facilities to the performance of therapeutic abortions, it may be subject to criminal prosecution. Many years ago, the Kansas Supreme Court defined the following limitation on the legislative power:

"The legislature cannot delegate to private individuals and private associations the power to make obligatory rules concerning the management and care of property, nor can it provide that the breach of such rules shall be a penal offense. Kansas v. Crawford, 104 Kan. 141, 177 P. 360 (1919)."

This rule is compatible with present federal constitutional law. Carter v. Carter Coal Co., 298 U.S. 238, 56 S.Ct. 855, 80 L.Ed. 1160 (1935). In this case, the Kansas Legislature has acted in apparent disregard of this constitutional limitation on their powers of delegation. And particularly since the result of this delegation has been the infringement of a fundamental right, the delegation vio-

---

24. Results of a survey conducted between 1963 and 1968 reveal a mortality rate of 10.3 per 100,000 for abortions which is 2.7 times safer than childbirth, 38.8 times safer than an appendectomy, and 155 times safer than cholecystectomy, all other factors being equal.

lates the Due Process Clause of the Fourteenth Amendment.[25]

Plaintiffs next attack centers on the following provision of K.S.A. 21–3407:

"No pregnancy shall be purposely terminated until the opinions of three (3) duly licensed physicians attesting to the necessity of such termination have been recorded in writing in the permanent records of the hospital. . . ."

This requirement is also present in K.S.A. 65–444. The basis for plaintiffs' attack on the provision appears twofold. First, they claim it arbitrarily classifies the abortion procedure and that the classification bears no reasonable relation to a compelling state interest. Second, the provision interferes with the physician's fundamental right to administer necessary health care to his patients.

Plaintiffs' position with respect to their first contention is that no basis for requiring the consultation of two additional physicians exists except to curtail the availability of abortions. They correctly point out that in regard to no other medical procedure does Kansas law require approval or consultation by a physician. Moreover, as previously discussed, the abortion procedure is neither so intricate or dangerous as to be classified apart from other medical procedures. No medical purpose, discernible to this Court, appears to be served by the requirement. However, this provision would enhance the decision making process and would be unobjectionable if, for example, it required consultation with a psychiatrist when the patient's mental health is advanced as cause for an abortion, or if consultation with a specialist were required when the attending physician was not a specialist. Unfortunately, under the present provision, hypothetical certification may be obtained from a dermatologist and a podiatrist without violating the statute. No legitimate state interest is advanced by such a result. Not even the state's admittedly legitimate interest in assuring that the decision to terminate is not haphazardly made, is furthered by this provision. Legislative schemes such as this are more often honored in the breach and ultimately afford no protection from the evil they purport to control. It became quite apparent on argument that Dr. Weller has a "rubber-stamp" type arrangement with other physicians. The state's interest in protecting the unborn embryo from unnecessary destruction will, in the Court's opinion, be better served by preserving the traditional patient-physician relationship and by reliance on the self-discipline and professional ethics and integrity of the medical profession.[26]

With respect to the three-physician requirement, plaintiffs further contend it infringes upon the fundamental right of physicians to administer necessary health care to their patients. They assert that the First, Ninth and Fourteenth Amendments protect the right of physicians as well as every other citizen to pursue his chosen profession free from unnecessary interference from the state.[27] Undoubtedly, physicians should be free to practice their profession and to exercise their professional discretion subject only to such regulations as are necessary for the protection of legiti-

25. A similar provision in the California abortion law was recently declared invalid on the same basis. People v. Barksdale, 18 Cal.App.3d 813, 96 Cal.Rptr. 265 (1971).

26. In Doe v. Bolton, supra, the district court upheld a provision of the Georgia abortion law which required approval in advance by a committee of the medical staff of the hospital in which the abortion was to be performed. It also provided the committee be established in accordance with JCAH standards. This provision strikes us as unduly restrictive; however, we believe the medical staff, as contemplated by the JCAH standards should serve as a guard against physicians abusing the abortion law.

27. See, e. g., Schware v. Bd. of Bar Examiners, 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed. 2d 796 (1957); Smith v. Texas, 233 U.S. 630, 34 S.Ct. 681, 58 L.Ed. 1129 (1914); Dent v. West Virginia, 129 U.S. 114, 9 S.Ct. 231, 32 L.Ed. 623 (1889).

mate public interests. It is undeniable in this case that the disputed provision infringes upon this right. In fact, the provision seeks to subordinate the attending physician's judgment to that of two other physicians without any showing that it effectively advances a legitimate state interest. Rather, its only effect is to classify abortions apart from other medical procedures and to curtail the availability of abortions in derogation of a woman's fundamental right to procure an abortion, and of the physician's right to administer to his patients in accordance with his best judgment. Therefore, the requirement of K.S.A. 21–3407 and K.S.A. 65–444, requiring the certification by three physicians in writing of the circumstances necessitating the abortion, violates the Equal Protection Clause of the Fourteenth Amendment.

■ Having found the statutory provisions objected to by plaintiffs to be constitutionally defective, the question remains whether the entire statute must fall or whether the objectionable provisions can be severed. If the provisions can be deleted from the statute without doing violence to the legislative intent, then the objectionable provisions may be severed. Fowler v. Gage, 301 F.2d 775 (10th Cir. 1962). The Court notes the legislative intent in enacting K.S.A. 21–3407 was to liberalize the circumstances under which an abortion could be obtained. Severance of the two provisions found objectionable by us would not do violence to this intent; in fact, severance of these unduly restrictive provisions would appear to be a furtherance of that intent. Accordingly, the Court rules that the provisions are severable.

In addition to declaratory relief, plaintiffs are also requesting the issuance of a preliminary injunction enjoining enforcement of the provisions just declared unconstitutional. Aside from determining if plaintiffs satisfy the requirements of 28 U.S.C.A. § 2283, the Court must also take into account the recent Supreme Court decisions which directly affect the availability of injunctive relief against a state's enforcement of its criminal laws. Prior to the decisions in *Younger* and its companion cases, injunctive relief of the sort requested by plaintiffs was available only upon a showing of great and immediate irreparable harm.[28] Moreover, a threat of prosecution was not considered irreparable unless the threat to plaintiffs' constitutional rights could not be eliminated by defense against a single prosecution. This rule was indicative of the Supreme Court's long-standing reluctance to permit federal interference with legitimate state activities. In *Younger*, the Supreme Court dwelled at length on the reasons underlying this policy. And although that case was expressly limited to situations where the state prosecution was pending, this Court feels that it did not alter the preexisting law in regard to threatened prosecutions and that the same logic which prohibits the enjoining of pending prosecutions applies as well to threatened prosecutions.

■ All of the courts which have struck down abortion statutes, or portions of them, have refused to issue injunctions for the reason that no showing of great and immediate irreparable harm was made. No such showing is made here, either. Nor do the facts alleged by plaintiffs bring this case within the *Dombrowski* rule. No chilling effect on First Amendment freedom of expression is either alleged or demonstrated, nor is there any proof of bad faith

28. See, e. g., Douglas v. City of Jeanette, 319 U.S. 157, 63 S.Ct. 877, 87 L.Ed. 1324 (1942) ; Williams v. Miller, 317 U.S. 599, 63 S.Ct. 258, 87 L.Ed. 489 (1942) ; Watson v. Buck, 313 U.S. 387, 61 S.Ct. 962, 85 L.Ed. 1416 (1941). However, a federal injunction may issue where there are allegations of bad faith and harassment for the purpose of discouraging the exercise of guaranteed rights or where there would be a "chilling effect" on freedom of expression if plaintiffs were forced to await the outcome of state proceedings. Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965).

or harassment for the purpose of discouraging protected activities. If prosecuted, plaintiffs would likely be able to vindicate their federal constitutional rights by defense in one criminal proceeding. This is especially true in view of this Court's adjudication on the constitutional issues. For all the foregoing reasons, this Court declines at this time to issue the requested injunction. If, in the future, plaintiffs should be able to show bad faith or harassment, as contemplated by the Supreme Court in the *Dombrowski* case, injunctive relief would be appropriate and available.